**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU<br><br>                Petitioner,<br><br>  v.<br><br>ACCREDITING COUNCIL FOR INDEPENDENT COLLEGES AND SCHOOLS<br><br>                Respondent. | Case No. 15-cv-1838-RJL<br><br>ORAL HEARING REQUESTED |

### ACCREDITING COUNCIL FOR INDEPENDENT COLLEGES AND SCHOOLS' OPPOSITION TO THE CFPB'S PETITION TO ENFORCE CIVIL INVESTIGATIVE DEMAND

Accrediting Council for Independent Colleges and Schools (ACICS) opposes the Consumer Financial Protection Bureau's (Bureau or CFPB) petition for an order requiring ACICS to comply with the CFPB's August 25, 2015 civil investigative demand (CID).

The CFPB's CID seeks to delve into the accreditation of educational institutions, an area that has no connection to the Bureau's authority to enforce the consumer financial laws. ACICS is an educational accrediting agency that is recognized and overseen by the Department of Education (Department or ED). The Bureau's specific purpose is to "regulate the offering and provision of consumer financial products or services under the Federal consumer laws." 12 U.S.C. § 5491(a). ACICS neither offers nor provides a consumer financial product or service nor does it engage in conduct that touches the offering or provision of a consumer financial product or service. The Bureau enforces no laws that could potentially reach ACICS's conduct, and, moreover, the CID concerns an investigation that is well outside the scope of the agency's authority.[1]

---

[1] Bureau counsel has indicated that the Bureau wants to learn more about the accrediting process. To this end, ACICS is willing, as the Bureau knows, to further educate the Bureau about this process, and has agreed to meet

There is good cause for the Court to deny the CFPB's petition and refuse to enforce the CID.

## BACKGROUND

### A. ACICS, Which Has Existed For More Than A Century, Is A Non-Profit Accrediting Agency That Is Specifically Sanctioned By The Department Of Education

ACICS was founded in 1912.  (Declaration of Albert C. Gray at ¶ 3).  It is a 501(c)(3) non-profit accreditation agency that has been nationally recognized since 1956 by the U.S. Secretary of Education as a reliable authority concerning the quality of education and training offered by the institutions that it accredits.  (*See id*. ¶ 3-4).  To achieve that recognition, ACICS periodically undergoes a review by the Department in accordance with the Secretary of the Department of Education's Recognition Procedures for National Accrediting Bodies, as set forth in 34 C.F.R. § 602 *et seq*.  If an accrediting agency meets the criteria established by the Secretary, the Secretary grants recognition and the accrediting agency is included in a list published by the Secretary in the Federal Register.  *See* 34 C.F.R. § 602.1.  Recognition by the Secretary means that there has been a finding that ACICS is a reliable authority regarding the quality of education or training offered at a particular institution. *See* 34 C.F.R. § 602.1.

On July 23, 2013, ACICS received a notification from the Department's Office of Postsecondary Education that it was renewing its recognition of ACICS "as a nationally recognized accrediting agency."  (Gray Decl. Ex. 1, July 23, 2013 letter to A. Gray from B. Dann-Messier).  This scope of recognition provides that ACICS is recognized for "the accreditation of private postsecondary institutions offering certificates or diplomas, and

---

with the agency in this regard.  The Bureau has not availed itself of this opportunity and has insisted that it only wants to get people "under oath."

postsecondary institutions offering associate, bachelor's, or master's degrees in programs designed to educate students for professional, technical, or occupational careers, including those that offer those programs via distance education." (*See id*.).

In accordance with the criteria of the ED, ACICS is governed by its Bylaws, which are incorporated into ACICS's published Accreditation Criteria: Policies, Procedures, and Standards. (*See* Gray Decl. ¶ 7). The ED regularly reviews these and ACICS's other policies and procedures in order to ensure that they comply with the Secretary's recognition criteria. (*See id*.).

ACICS carries out its accreditation functions through a Council of 15 Commissioners, which includes Commissioners representing both non-degree and degree-granting institutions, as well as at least three Commissioners drawn from the public at large. (*See id*. ¶ 8). Currently, ACICS accredits 890 postsecondary institutions enrolling at least 609,207 students. (*See id*. ¶ 6).

ACICS's accrediting process has multiple parts. (*See id*. ¶ 10). At the core of the process is a peer review component – that is a review process that involves volunteer evaluators who review and evaluate all aspects of how their peer institutions operate, with an understanding that their candor ensures the integrity of the accrediting process. (*See id*. ¶ 11). After an institution seeking accreditation completes an extensive self-evaluation, an ACICS staff member visits the institution for a preliminary assessment of the institution's resources. (*See id*. ¶ 12). Then, ACICS assembles a team of volunteer evaluators who conduct an on-site visit of the institution, review that institution's operations and author a report. (*See id*. ¶ 13). This team of volunteer evaluators includes academics and administrators who are affiliated with peer institutions. (*See id*.). It also includes volunteer public members, who are academics and administrators affiliated with institutions that are not accredited by ACICS. (*See id*.). Indeed,

the Department of Education requires that ACICS's Commission include "representatives of the public" that have no pre-existing affiliation with accredited schools or related organizations.  *See* 34 C.F.R. §§ 602.3, 602.14(b).  The evaluators' report is then sent to an Intermediate Review Committee, appointed by ACICS, and similarly comprised of experienced individuals who are affiliated with peer institutions and other institutions of higher education, as well.  (*See id*. ¶¶ 13-14).  The Intermediate Review Committee then makes a recommendation to the Council which ultimately makes the final accrediting decision.  (*See id*. ¶¶ 14-15).

Most recently, as a result of the CID that the Bureau served on ACICS, a number of volunteer evaluators and their school employers have stated their concerns about continuing to participate in the accrediting process.  (*See id*. ¶ 17).  This could reduce the total pool of peer evaluators from which ACICS can draw for the accrediting process.  (*See id*.).  These volunteer evaluators have expressed an intent to withdraw from this process out of concern that the CID, which seeks the identities of certain evaluators for the presumptive purpose of taking sworn testimony, will, among other things, compromise the necessarily candid evaluation process.  (*See id*. ¶ 18)

    **B.**    **The Department Of Education Has Recognized ACICS As An Accreditor, Subject To A Long-Established Regulatory Process That Does Not Involve Any Aspect Of Student Lending**

The Department has detailed regulations setting forth the qualifications of accrediting agencies.  *See* 34 C.F.R. § 602.14(a).[2]  The Department's recognition process does not address an accrediting agency's substantive decision-making; rather the Department ensures that the agency maintains an effective process for arriving at impartial, fair and deliberative accrediting

---

[2] *See also*, Guidelines for Preparing/Reviewing Petitions and Compliance Reports, Department of Education Accreditation Division (January 2012) ("Accreditation Guidelines"), at 17, located at http://www2.ed.gov/admins/finaid/accred/agency-guidelines.doc).

decisions. (Declaration of Dennis M. Cariello ¶¶ 6, 9, 12-14). The Department – through its recognition process – routinely reviews the performance of accrediting agencies, and it has the authority to investigate and take action if an accrediting agency violates one or more rules that the Department enforces. (*See id*. ¶ 13).

To this end, the Department is charged with ensuring that (a) a private accrediting agency (one that is not a state regulatory body) is comprised of voluntary members; (b) that the primary purpose and mission of the agency is accreditation of educational institutions and/or programs; (c) that the accrediting agency is "separate and independent" of "any affiliated, associated or related trade association thus clarifying and demonstrating the autonomy and integrity of the accreditation activity"; (d) that an accreditor must have and demonstrate "clear and effective controls against conflicts of interest, or the appearance of conflicts of interest"; (e) that an accrediting agency had the administrative and financial capability to carry out its functions; and (f) that the agency maintains policies that are consistent with federal standards. Accreditation Guidelines at 17; (*see also* Cariello Decl. ¶ 10). The Department also ensures that institutional accreditors, such as ACICS, review postsecondary institutions for numerous criteria, including curricula, faculty, quality of facilities, student support services, and recruiting and admissions practices. (*See id*. ¶ 11).

Indeed, United States Senator Lamar Alexander and Congressman John Kline, the Chairman of the Senate Committee on Health, Education, Labor, & Pensions, and the Chairman of the House Committee on Education and the Workforce, respectively, have specifically emphasized that accrediting agencies such as ACICS are uniquely focused only on reviewing the quality of education provided by accredited institutions. In an October 23, 2015 letter to the CFPB's director, the members of Congress explain that "[u]nder the Higher Education Act,

Congress has set up a robust process for the Department of Education to recognize accrediting agencies. Led solely by the Department of Education, this process ensures only those accrediting agencies that act as a reliable authority of educational quality and meet the required criteria laid out in the law are recognized by the Secretary." (Gray Decl. Ex. 2, Oct. 23, 2015 Letter from Hon. Lamar Alexander and Hon. John Kline to CFPB Director Richard Cordray).

Given the extensive level of Department oversight of the accrediting process, coupled with accrediting agencies' "wide-ranging expertise in what may be highly technical and specialized fields of education," courts around the country have explained that recognized accrediting agency decisions are entitled to significant deference. *Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. & Colleges*, 781 F.3d 161, 169-71 (4th Cir. 2015); *accord Thomas M. Cooley Law Sch. v. Am. Bar Ass'n,* 459 F.3d 705 (6th Cir. 2006); *Wilfred Acad. of Hair & Beauty Culture v. S. Ass'n of Colls. & Schs.,* 957 F.2d 210 (5th Cir. 1992). Courts are not "equipped to substitute [their] own judgment for the professional judgment of the educators involved in the accreditation process." *Prof'l Massage*, 781 F.3d at 172 (citing *Wilfred*, 957 F.2d at 214).

Tellingly, the Congressmen also explain that "an accreditation review of an institution has no direct and immediate impact on the financial activity of a consumer with an institution." (Gray Decl. Ex. 2, Oct. 23, 2015 Letter). The Department specifically confers eligibility on schools that seek to participate in its Title IV student financial aid programs – that is the program that offers federally-funded student loans and grants. (*See* Cariello Decl. ¶ 6). While the Department may not confer eligibility on any institution unless it is accredited and also licensed by a state, the Department makes any decision about Title IV eligibility based on a thorough evaluation process that is independent of any accrediting agency's determination or process.

(*See id.* ¶¶ 17-19). Thus, a school could be accredited but still not eligible for federally-funded student loans. In addition, there is no necessary connection between accreditation and private student lending. (*See id*. ¶ 21). For example, a school, including a for-profit college, may have students who are eligible to receive private loans whether or not that school is accredited by ACICS or any other accreditor. (*See id.*). There is no financial connection between a student who receives a loan to attend a for-profit college and the accrediting process itself.

ACICS is an accrediting agency that the Department of Education has recognized for nearly sixty years. Its oversees a highly-prescriptive and independent accrediting process that is comprised of volunteer evaluators, who predominantly hold academic or administrator posts at peer institutions and at other institutions of education. This process is neutral by design, and by regulation. No part of the accrediting process concerns any decision to extend a loan to a student of a for-profit college or otherwise involves the provision of a consumer financial product or service.

## **ARGUMENT**

The Court should not enforce the Bureau's CID and should deny its petition. The law is clear that the "'judicial role' in evaluating an administrative subpoena enforcement petition" must consider "whether 'the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *U.S. v. Capitol Supply, Inc*., 27 F. Supp. 3d 91, 99 (D.D.C. 2014). The CFPB lacks the authority to request the information that it seeks in its CID, and for this reason, the information that it seeks is not "reasonably relevant." The CID is also unduly burdensome. Although courts afford agencies substantial deference in the handling of their investigations and in the propounding of CIDs, that deference and

"subpoena enforcement power is not limitless, however." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001). A CID cannot exceed an agency's statutory authority.

Indeed, Senator Alexander, who is also a former Secretary of Education, and Congressman Kline agree that the CID is improper. In their October 23, 2015 letter to the CFPB's Director, the members of Congress wrote that the CFPB's CID to ACICS is an "unprecedented overreach by the [CFPB] and raises serious concerns regarding jurisdiction given the CFPB's limited enforcement authority that does not in any way include the higher education accreditation process." (Gray Decl. Ex. 2, Oct. 23, 2015 Letter). Senator Alexander and Congressman Kline explain that "Federal law is clear about the role and responsibilities of accrediting agencies, as well as the role and responsibilities the Department of Education plays in recognizing accrediting agencies. Nowhere does the law authorize a role or responsibility for the CFPB." (*Id.*). Finally, the members of Congress emphasized that the CFPB's investigation constitutes "an unprecedented intrusion by [the CFPB] into higher education and undermines the process Congress created to assess institutional quality." (*Id.*). For these and other reasons discussed below, the Court should deny the CFPB's petition to enforce the CID.

I. **The Bureau Does Not Have The Legal Authority To Pursue Its Investigation And The CID Does Not Seek Any "Reasonably Relevant" Information**

The Bureau's investigation into the accreditation process falls outside the scope of the express limits on the agency's investigative authority. The Notice of Purpose of the CID states that the Bureau is investigating to determine "whether any entity or person has engaged or is engaging in unlawful acts or practices *in connection with accrediting for-profit colleges*." (Konop Decl Ex. A, ECF No. 1-3) (emphasis added). The Bureau, however, only enforces consumer financial laws. There is no consumer financial law that addresses, regulates or even implicates "acts or practices in connection with [the] accrediting [of] for-profit colleges."

Moreover, ACICS neither offers nor provides a consumer financial product or service nor facilitates the provision of a consumer financial product or service. Thus, the Bureau has no authority to propound this CID. This is true whether the CID seeks information from ACICS as a third-party, a subject of interest or as a potential subject of any investigation.

### A. The CID Exceeds The Authority Granted To The Bureau Under The Plain Language Of The Consumer Financial Protection Act (CFPA)

It is axiomatic that a CID cannot be enforced when "a governmental investigation . . . may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power" of the agency serving the administrative subpoena or CID. *U.S. v. Morton Salt Co.*, 338 U.S.632, 652 (1980). "Accordingly, 'there is no doubt that a court asked to enforce a subpoena will refuse to do so if the subpoena exceeds an express statutory limitation on the agency's investigative powers.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001) (quoting *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 369 (7th Cir. 1983)). Thus, it is necessary to ensure that "'the subject matter of the investigation is within the statutory jurisdiction of the subpoena-issuing agency.'" *Id*. at 586-87 (quoting *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 386 (D.C. Cir. 1981)).

The plain language of the CFPA makes it clear that the Bureau's investigative authority is limited to enforcement of the consumer financial laws. This means that any investigation that the Bureau pursues must concern conduct that could arise from a violation of a consumer financial law. The CFPA states that an investigation "means any inquiry . . . for the purpose of ascertaining whether any person is or has been engaged in any conduct that is a violation." 12 U.S.C. § 5561(1). The statute further defines "violation" to mean any "act or omission that, if proved, would constitute a violation of any provision of **Federal consumer financial law**." 12 U.S.C. § 5561(5) (emphasis added). The Bureau may propound a CID to obtain any documents

9

or information that may be "relevant to a violation" of a consumer financial law. 12 U.S.C. § 5562(c)(2). Consumer financial law, in turn, means one of eighteen enumerated consumer financial laws,[3] as well as the Bureau's authority to prohibit unfair, deceptive, or abusive acts or practices in connection with the sale or provision of a consumer financial product or service (UDAAP authority). None of the consumer financial laws address or implicate – even taking the most expansive view of those laws – the accrediting process of for-profit colleges.

The CFPA mandates that every CID issued "shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation" of consumer financial law. 12 U.S.C. § 5562(c)(2). This is the only specific statutory requirement that the Bureau must follow when it issues a CID. *See id*. As the Bureau has acknowledged in its administrative response to ACICS's petition to modify or quash the CID, this Notice of Purpose is designed to "inform[] ACICS of the conduct of interest to the Bureau and the potentially applicable provisions of law."[4]

Accordingly, the Bureau's investigative authority is not boundless, as the CFPA's required Notice of Purpose makes clear. The Bureau can only propound a CID that seeks information that is relevant to conduct that could be actionable under a law that the Bureau enforces. And the Notice of Purpose makes it clear that the Bureau's investigation here concerns alleged conduct that could never be actionable under any consumer financial law, including the

---

[3] "Enumerated Consumer Laws," include, for example, the following statutes: the Alternative Mortgage Transaction Parity Act of 1982 (12 U.S.C. § 3801 *et seq.*); the Consumer Leasing Act of 1976 (15 U.S.C. § 1667 *et seq.*); the Equal Credit Opportunity Act (15 U.S.C. § 1691 *et seq.*); the Fair Credit Billing Act (15 U.S.C. § 1666 *et seq.*); the Home Owners Protection Act of 1988 (12 U.S.C. § 1692 *et seq.*); the Fair Debt Collection Practices Act (15 U.S.C. § 1692 *et seq.*); the Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2801 *et seq.*); and the Truth in Lending Act (15 U.S.C. § 1601 *et seq.*). (*See* 12 U.S.C. § 5481(12)).

[4] *See* Bureau Resp. to Pet. to Modify or Quash CID at 3 at www.cfpb.gov.

Bureau's UDAAP authority, as discussed further below.  The Bureau's investigation, and thus, the CID, exceed statutory authority.

>  B. **The Accrediting Process Has No Connection To The Consumer Financial Laws**
>
>  1. **ACICS Does Not Offer Or Provide A Consumer Financial Product Or Service Or Otherwise Touch Any Transaction That Involves The Provision Of Such A Product Or Service**

The CID's Notice of Purpose also states that the conduct being investigated potentially constitutes a violation under the Bureau's UDAAP authority.  Specifically, the CFPA grants the Bureau the authority to take action against any "covered person" or "service provider" that engages in an unfair, deceptive or abusive act or practice in connection with "any transaction with a consumer for a consumer financial product or service or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a).  ACICS is neither a covered person nor a service provider within the meaning of the CFPA.

The Act defines a "covered person" as (a) any person that engages in offering or providing a consumer financial product or service; and (b) any affiliate of a person described in subparagraph (a) if such affiliate acts as a service provider to such person. 12 U.S.C. § 5481(6). ACICS does not fall within either of these two categories.  "Financial products or services," as the name implies, are defined to include an array of activities related to consumer finance, such as "extending credit and servicing loans," "providing real estate settlement services," "engaging in deposit-taking activities," "providing check cashing" services, "providing financial advisory services" including "credit counseling," or assistance with "debt management or debt settlement," or "collecting debt related to any consumer financial product."  12 U.S.C. § 5481(15)(A).  Quite simply, ACICS cannot be considered a covered person under subsection (a) because it does not engage in or provide any consumer financial products or services.

Similarly, ACICS does not fall within the narrow definition of an "affiliate" of a covered person under subparagraph (b).  An "affiliate" is "any person that controls, is controlled by, or is under common control with another person." 12 U.S.C. § 5481(15)(A)(viii).  ACICS plainly does not "control" the institutions that it accredits.  There is no corporate legal connection between ACICS and the institutions that it accredits; in fact, as noted, above, ACICS's independence is a necessary qualification for Department recognition.  While ACICS provides accreditation standards and can withdraw accredited status if an institution fails to abide by these standards, the accredited institutions are free to choose from a number of accrediting agencies across the country and can leave ACICS at any time.  (*See* Gray Decl. ¶ 9).  ACICS simply cannot be considered an "affiliate" of any covered person, including any for-profit college.

ACICS is also not a "service provider" within the meaning of the CFPA.  A "service provider" is "any person that provides a *material service to a covered person in connection* with the offering or provision by such covered person of a consumer financial produce or service." 12 U.S.C. § 5481(26) (emphasis added).  The statute further provides two examples of material services: (i) "participates in the designing, operating, or maintaining the consumer financial product or service; or (ii) processes transactions relating to the consumer financial product or service." *Id*.  A service provider must provide services to a covered person that are inherently or demonstrably connected to the consumer financial product or service offered or provided by the covered person, and not just *any* service or relationship.  *See id*.  Indeed, this is plainly consistent with Congress's stated purpose for the CFPB of "ensuring that the federal consumer financial laws are enforced consistently so that consumers may access markets for financial products, and so that these markets are fair, transparent, and competitive." 12 U.S.C. § 5511(a).

The Bureau attempts to remedy the lack of any nexus between its ostensible investigation and the consumer financial laws that it enforces. In its Memorandum in Support of its Petition, the CFPB implies that because it "has investigated for-profit colleges for deceptive practices tied to their private student-lending activities," it may now pursue an "investigation to determine whether any entity or person has engaged or is engaging in unlawful acts and practices in connection with accrediting for-profit colleges." (Mem. at 5, ECF No. 1-2). Any past or ongoing investigation into private student lending activities cannot justify the Bureau's investigation here. The private student lending activities of for-profit colleges and the accrediting process have no connection that could implicate a consumer financial law. For example, neither ACICS nor any other accreditor determines whether the Department of Education or a private student lender funds a student loan at a for-profit college. (Cariello Decl. ¶¶ 17-21). Neither the fact of accreditation nor the accreditation process itself necessarily informs any private student lender's decision to fund a student loan. (*See id*. ¶ 21). Similarly, neither ACICS nor any other accreditor is involved in any aspect of the funding of a loan, extension of a loan, underwriting of a loan, marketing of a loan, or servicing of a loan. (*See* Gray Decl. ¶¶ 19-20; Cariello Decl. ¶¶ 17-21). Neither ACICS nor other accreditors participate in any student-facing interactions concerning any student lending. (*See* Gray Decl. ¶¶ 19-20; Cariello Decl. ¶¶ 17-21).

      **2.**    **ACICS Has Never Offered Substantial Assistance Within The Meaning Of The CFPA**

In its Memorandum, the Bureau also makes passing reference to its authority over persons who "knowingly or recklessly provide substantial assistance to a covered person" engaging in UDAAP violations. (Mem. at 4). In doing so, the Bureau seems to imply that ACICS, may be involved in the Bureau's investigations into alleged deceptive practices by for-

profit colleges relating to student-lending. However, as noted above, ACICS has no involvement in the financial aid, student loans, or any other financial arrangement between its accredited institutions and students. ACICS plainly does not offer *any* assistance in the area of student finance to its accredited institutions, let alone *substantial* assistance.

Moreover, to succeed on a theory that ACICS "substantially assisted" a primary violator of the Bureau's UDAAP prohibitions, the CFPB would have to show that ACICS "in some sort associated [itself] with the venture, that [it] participated in it as something that [it] wished to bring about, that [it] sought by [its] action to make it succeed." *S.E.C. v. Grendys*, 840 F. Supp. 2d 36, 46 (D.D.C. 2012) (citing *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 36 (D.C. Cir. 1987)). "In other words, the primary violation must be a 'direct or reasonably foreseeable result' of the aider and abettor's conduct." *Id.* (citing *SEC v. Johnson*, 530 F.Supp.2d 325, 337 (D.D.C. 2008). In determining whether a party's actions rise to the level of substantial assistance, courts consider whether the party had a "heightened economic motivation" to aid in the primary violation. *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1330 (S.D.N.Y. 1997) (brokers making large profits because of primary fraud had extraordinary economic motives).

Here, there is no plausible "substantial assistance" theory that can justify the Bureau's CID. First, ACICS *is a non-profit organization*. It has no economic motivation to assist for-profit schools in alleged deceptive practices that in turn lead to students taking out private student loans to attend for-profit colleges. Second, it cannot plausibly be alleged that ACICS wished to bring about any deceptive practice or that it sought by its action to make some deception succeed. Given the multi-tiered, peer reviewed, nature of the accrediting process, there is no apparent motive for any person who participates in this process to have sought to

bring about any alleged deceptive or otherwise unlawful practice.  As noted above, the accrediting process is comprised of voluntary peer evaluators that author the initial report; an Intermediate Review Committee that is also comprised of volunteer peer evaluators who are non-ACICS employees or directors; and the ACICS Council, itself, that determines whether to adopt the recommendation of that committee.  Given the multi-tiered, peer reviewed, nature of the accreditation process it also strains credulity to suggest that ACICS sought to make for-profit schools' alleged deception succeed.

Third, it cannot be said that the alleged practice of deceiving students into taking out private loans is the "direct or foreseeable result" of ACICS's accreditation process, especially as ACICS has no involvement in any decision to make or fund a student loan.  Allowing such upstream conduct to constitute substantial assistance would stretch the bounds of aiding and abetting liability beyond any recognizable legal doctrine.  Any entity or individual with the slightest relationship – no matter how attenuated or neutral – to a party that is allegedly engaging in a violation of  a consumer financial law would be subject to the Bureau's enforcement authority.  Such a result would, of course, vitiate the CFPA's knowledge or recklessness requirement as to any substantial assistance cause of action.  *See e.g.*, 12 U.S.C. § 5536(a)(3).

In light of the attenuated nature of the services provided by ACICS and the fact that ACICS has no role in determining whether a student procures a loan, there could not be any plausible claim that ACICS substantially assisted a primary violation of consumer protection laws.  The Bureau's CID clearly exceeds its investigative authority, whether ACICS is viewed as a potential subject of any investigation or a third-party with potential information about alleged violations of consumer financial laws.

### C. The CID Is Also Not Reasonably Relevant

The Bureau's lack of investigative authority means that its CID cannot seek "reasonably relevant" information. Indeed, "the relevance of the agency's subpoena requests may be measured only against the general purposes of its investigation." *Texaco*, 555 F.2d at 874. The Bureau, however, glosses over this fact, and instead, contends that its assertion of relevance is entitled to deference, without even attempting to state – let alone explain – that an investigation into "the accrediting of for-profit colleges" touches the Bureau's authority to enforce consumer financial laws. (Mem. at 6). The law, however, is clear that deference is not presumed when an agency "is 'obviously wrong.'" *U.S. v. Capitol Supply, Inc.*, 27 F. Supp. 3d at 99 (quoting *Invention Submission Corp.*, 965 F.2d at 1089). And, here, the Bureau is obviously wrong about the contours of its own investigative authority, and, thus, about the relevance of the information that the CID seeks. The plain language of the CFPA, coupled with the actual accrediting process make it clear that the Court should decline to enforce the Bureau's CID.

### II. The CFPB's CID Is Also Unreasonably Burdensome

Courts have long noted that they will fail to enforce a CID when "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *Texaco*, 555 F.2d at 882. The Bureau's CID seeks information, the production of which would hinder such operations. Here, the CID imposes a burden on ACICS that extends well beyond the financial impact and time commitment of responding to the broad information request. Specifically, the CID seeks the names of individuals who are involved in the accrediting decisions related to certain institutions. This includes the identity of volunteer evaluators who serve in an academic capacity at a peer institution or other institution of higher education, including instructors, professors and

adjunct professors who have "day jobs," but volunteer their time for the accrediting process. These volunteers, in turn, participate in a rigorous application process through which they are selected to become evaluators in the highly-controlled accrediting process. (*See* Gray Decl. ¶ 11).

Of course, if the Bureau's CID is enforced, then an evaluator's inclination to volunteer his time will diminish, if not disappear altogether. An evaluator's mere participation in the accrediting process cannot result in his identity being produced to the Bureau for the presumptive purpose of enabling that agency to take sworn testimony about confidential and anonymous deliberations concerning a process that the Bureau has no authority to regulate. The CID seeks information that goes to the heart of the peer review evaluation and the integrity of the accrediting process itself. The mere propounding of the CID has already disrupted the accrediting process and had a chilling effect on the likely future participation of its evaluators. Indeed, to date, some evaluators have expressed their intention to no longer participate in the accrediting review process. (*See* Gray Decl. ¶¶ 17-18). Such an outcome could ultimately and permanently harm the accrediting process, which is also expressly supervised by the Department of Education.

## **CONCLUSION**

For all of the foregoing reasons, the Court should deny the Bureau's Petition to Enforce the Civil Investigative Demand. The Bureau's CID is outside the agency's statutory authority and seeks to investigate conduct that does not concern any consumer financial law that the Bureau enforces. Moreover, the CID seeks information the production of which would substantially hamper the core component of the accrediting process, which is already overseen by the Department of Education.

**Oral Hearing Requested**

Pursuant to LCvR 78.1, ACICS request an oral hearing on this opposition.  An oral hearing is particularly appropriate here given the importance of the issues at stake, including the independence of the accreditation process, the potential chilling effect on the participation of peer evaluators, and the burden that ACICS – a neutral non-profit institution – would suffer if the CID was enforced as written.

Date: December 2, 2015

Respectfully submitted,

/s/ Allyson B. Baker
Allyson B. Baker (# 478073)
Benjamin E. Horowitz (# 1017262)
Andrew T. Hernacki (D.C. Bar No. 1024442, *pro hac vice forthcoming*)
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone:  (202) 344-4000
Facsimile:  (202) 344-8300
Email:  abbaker@venable.com
behorowitz@venable.com
athernacki@venable.com

***Counsel for Respondent Accrediting Council for Independent Colleges and Schools***

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of December, 2015, I caused the foregoing to be served via ECF upon all counsel of record, as follows:

>Benjamin Konop, Esq.
>Kristina Betts, Esq.
>Enforcement Attorney
>Consumer Financial Protection Bureau
>1700 G Street NW
>Washington, D.C. 20552
>Phone: 202-435-7265
>Email: benjamin.konop@cfpb.gov
>        Kristina.Betts@cfpb.gov

/s/ Allyson B. Baker
Allyson B. Baker